IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LORENZO NUNN, | |
| Plaintiff, | 4:14-CV-3220 |
| vs. | |
| DILLON AUTO SALES, INC., | MEMORANDUM AND ORDER |
| Defendant. | |

The plaintiff, Lorenzo Nunn, has sued his former employer, Dillon Auto Sales, Inc., for race discrimination under Title VII of the Civil Rights Act (42 U.S.C. § 2000e-2), the Nebraska Fair Employment Practices Act (Neb. Rev. Stat. § 48-1104), and 42 U.S.C. § 1981. Filing 1-1. This matter is before the Court on the defendant's motion for summary judgment or, in the alternative, motion for partial summary judgment (filing 49), and motion to strike (filing 53). For the reasons explained below, the Court will grant in part and deny in part the defendant's motion for summary judgment, and will deny the defendant's motion to strike.

BACKGROUND

The parties agree that the plaintiff, who is African-American, was employed by the defendant, which is a used-car dealership, on two separate occasions: first, from July 2012 to May 2013, and second, for a few weeks in November 2013. Filing 50 at 3, 4.

During his first tenure of employment, the plaintiff worked for the defendant as a salesman at one of its Lincoln locations. Filing 50 at 4. He was hired by Steve Vitamvas, and his supervisors were Vitamvas and Terry Devine. Filing 50 at 4. The plaintiff has produced evidence that during this period of employment, Chris Dillon,[1] the defendant's owner, made racially charged comments to him. *See* filing 52 at 7. For instance, the plaintiff stated in his deposition that Dillon told him "that I was too good of a salesman to be trying to help black people, and a lot of blacks can't buy vehicles, they're dead beats, I am wasting my time." Filing 51-3 at 18.

---

[1] The Court will refer to Dillon Auto Sales, Inc. as "the defendant," and to Chris Dillon as "Dillon."

1

The parties agree that on May 1, 2013, the plaintiff resigned from employment with the defendant. Filing 50 at 4. According to the defendant, the plaintiff resigned solely because he did not agree with the way in which the defendant split the plaintiff's commission with another employee on a particular vehicle sale. Filing 50 at 4. The defendant points to the plaintiff's deposition testimony, in which he explained, "The commission made me leave that place." *See*, filing 50 at 4; filing 51-3 at 17. The defendant also notes that the plaintiff stated in his deposition that he did not believe race played a role in the decision to split his commission. *See*, filing 50 at 4; filing 51-3 at 17. Further, the plaintiff stated in his deposition that he did not believe, at the time he resigned, that he was being discriminated against on the basis of his race. *See*, filing 50 at 4; filing 51-3 at 18.

The plaintiff does not dispute that he resigned because of his dissatisfaction with the split commission, or that the split commission was not motivated by race. Filing 52 at 7. But the plaintiff suggests that there was another motivating factor in his decision to resign: he stated in his deposition that he had difficulty getting along with two other employees—Chad Engel and Russ Kyle. Filing 52 at 7; filing 51-3 at 15. However, the plaintiff said in his deposition that their issues were related to "personal stuff," and that neither Engel nor Kyle ever made comments with a racial component. Filing 51-3 at 16. Additionally, the plaintiff stated at a later point in his deposition that Engel and Kyle had "nothing to do with" his decision to resign. Filing 51-3 at 17.

Finally, the plaintiff implies that he resigned in part because of the racially charged comments Dillon made to him. *See* filing 52 at 7. In support of this contention, the plaintiff cites a portion of his deposition in which he discusses those comments. Filing 52 at 7. But the statements cited actually support the conclusion that Dillon's comments did *not* motivate the plaintiff to resign: the plaintiff said, "Chris Dillon said stuff to me as far as racial—racial stuff, those comments, but that didn't lead me to—you know, I came back to Dillon's." Filing 51-3 at 18. And the plaintiff identifies no other evidence that Dillon's racially charged comments caused him to resign.

The parties agree that immediately after the plaintiff left his employment with the defendant in May 2013, he began working for RPM Motors. Filing 50 at 5. His supervisors at RPM Motors were Brent Zywiec, Jason Klement, and Jason Svoboda. Filing 50 at 5.

The parties do not dispute that on November 6, 2013, the plaintiff was rehired by the defendant as a salesman. Filing 50 at 4. The decision to rehire the plaintiff was made by Devine and Terry Troutner. Filing 50 at 4. The plaintiff's employment was subsequently terminated on November 26, 2013. Filing 50 at 5. The parties do not dispute that Dillon made the decision to

2

terminate the plaintiff's employment. Filing 50 at 5. However, they disagree as to Dillon's reasons for that decision.

According to the defendant, Dillon decided to terminate the plaintiff's employment after Dillon received a call from Jason Svoboda, the owner of RPM Motors. Filing 50 at 5. The defendant contends that Svoboda told Dillon that he believed the plaintiff had stolen money from RPM Motors when the plaintiff was employed there. Filing 50 at 5. According to the defendant, Dillon decided that "he should not allow this type of employee to continue to work for Dillon Auto." Filing 50 at 5. He directed Devine and another manager named Jeremy Schwartz to terminate the plaintiff's employment. Filing 50 at 5.

According to the plaintiff, Troutner was the person who fired him. *See* filing 52 at 7. In his deposition, Troutner said that he asked Dillon why he wanted to terminate the plaintiff, given that the defendant was short-staffed. Filing 52 at 7. According to Troutner, Dillon told him he "didn't want his type working there." *See*, filing 52 at 8; filing 52-1 at 3. When Troutner asked Dillon what he meant by "his type," Dillon said, "You know what I mean." Filing 52-1 at 3–4.

In Troutner's interpretation, Dillon was referring to the plaintiff's race. Filing 52 at 8; filing 52-1 at 4. Troutner explained in his deposition that he believed this to be Dillon's meaning based on events surrounding the earlier firing of Keith Prickard, another employee who was African-American. *See*, filing 52 at 8; filing 52-1 at 4. Prickard was terminated by Vitamvas while Troutner was out of town. Filing 52-1 at 4. According to Troutner, Vitamvas told him that Dillon had instructed Vitamvas to fire Prickard because "we didn't want his type working there." Filing 52-1 at 4.

Additionally, the plaintiff points to Troutner's statement in his deposition that, a few days after the plaintiff was terminated, Dillon told Troutner that the owner of another dealership thought the plaintiff had stolen money from the dealership. *See*, filing 52 at 8; filing 52-1 at 7. According to Troutner, Dillon said, "[W]e'll use that as an excuse for his termination." *See*, filing 52 at 8; filing 52-1 at 7. The plaintiff also directs the Court's attention to a Nebraska Department of Labor form titled "Request to Employer for Separation Information." *See*, filing 52 at 8; filing 52-3. The form was addressed to Dillon Auto Sales, care of Sheryl Pont. Filing 52-3. The form was filled out by hand, and bears Pont's signature. Filing 52-3. Next to the signature, Pont's job title is listed as "Controller." Filing 52-3. One item on the form directs, "Explain why the claimant is no longer working for you." Filing 52-3. The handwritten response states, "His brief stint in Nov. 2013 ended due to lack of production." Filing 52-3.

3

The parties do not dispute that, after his employment with the defendant was terminated, the plaintiff was hired by Morrissey Motors. Filing 50 at 5. He was hired soon after his termination, but decided not to begin work until January 2014. *See*, filing 50 at 5; filing 52 at 9. According to the plaintiff, he made this decision because his "Thanksgiving was already messed up" as a result of his termination, and he had made plans to celebrate Christmas and New Year's with family in Illinois. Filing 52 at 9; filing 51-3 at 25.

The parties agree that the plaintiff's pay at Morrissey Motors was 25% of the front-end gross on the sales that he made. Filing 50 at 5–6. They also agree that he was paid 25% of the front-end gross on the sales that he made when he worked for the defendant. Filing 50 at 6. However, the plaintiff contends that the gross at Morrissey Motors was different from the gross at the defendant company. Filing 52 at 9. The plaintiff worked at Morrissey Motors until January 7, 2015. Filing 50 at 6. He was incarcerated from January 8, 2015 to July 2, 2015. Filing 50 at 6.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The existence of a mere scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken

4

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

Rule 56 allows the Court to grant summary judgment as to some issues but not as to others. *See* Fed. R. Civ. P. 56(a). Upon doing so, the Court may "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute," and thereby treat such a fact "as established in the case." Fed. R. Civ. P. 56(g).

## ANALYSIS
### I. Motion to Strike

The defendant moves to strike certain evidence the plaintiff relies on in opposing the defendant's motion for summary judgment. Filing 54. For the reasons discussed below, this motion will be denied.

A. Filing 52-3

First, the defendant moves to strike filing 52-3. Filing 54 at 2. The exhibit is a copy of a form titled "Request to Employer for Separation Information." Filing 52-3. At the top of the form is an address block that reads "Dillon Auto Sales Inc. c/o Sheryl Pont 6345 N 28th Street Lincoln NE 68521." Filing 52-3 (formatting omitted). The form has been filled out by hand, and bears the signature of Sheryl R. Pont, who lists her title as "Controller." Filing 52-3. The defendant moves to strike this exhibit and all references to it on the grounds that it was not authenticated, that no foundation has been laid for it, that it is incomplete, and that it contains hearsay. Filing 54 at 2.

Under Fed. R. Civ. P. 56(c)(2), a party may object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Then, the burden is on the proponent "to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c) advisory committee note (2010).

First, the defendant argues that the exhibit should be stricken because it has not been properly authenticated. Filing 54 at 3. According to the defendant, the plaintiff has offered no evidence showing that Pont is really the person who filled out the form, or that she really is the controller of the defendant company. *See*, filing 57 at 3; filing 54 at 3. But after Fed. R. Civ. P. 56 was amended in 2010, submission of unauthenticated documents in support of or opposition to a summary judgment motion no longer violates it *per se*. *See Foreword Magazine, Inc. v. OverDrive, Inc.*, 2011 WL 5169384, at \*2 (W.D. Mich. 2011). Instead, the proper objection to unauthenticated evidence is that it cannot be authenticated, and therefore cannot be presented in admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2); *see also*

5

*Foreword Magazine,* at *2.[2] Here, defendant has not attempted to assert that the plaintiff is unable to authenticate filing 52-3. Thus, the Court will not strike these exhibits on the basis of authentication.

Next, the defendant argues that the exhibit should be stricken because no foundation has been laid for it. Filing 54 at 2. But as explained above, the only proper objection to evidence offered in opposition to summary judgment is an objection that the material cannot be presented in admissible form. Here, the defendant has not attempted to argue that the plaintiff will be unable to lay proper foundation for this exhibit at trial. Accordingly, the Court will not strike filing 52-3 on the basis of foundation.

Third, the defendant objects to filing 52-3 on the grounds that the plaintiff "purportedly failed to submit a complete copy" of it. Filing 54 at 2. And there is reason to believe that there is a second page to the form that was not included in the defendant's submission; the single page that was submitted bears the handwritten note "2 pages." Filing 52-3. But a document is not inadmissible solely because it is incomplete. Rather, if one party has submitted an incomplete statement, the adverse party "may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. The defendant has not explained how it would be unfair for the Court to consider the first page of the form without the second page, nor has the defendant provided the missing page for the Court's consideration. Thus, the Court will not strike filing 52-3 on the basis of incompleteness.

Finally, the defendant argues that the information written on the form constitutes hearsay, and is inadmissible. Filing 54 at 2. But under Fed. R. Evid. 801(d)(2), a statement made by a party is not hearsay when offered against that party. This includes statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed," as well as statements "made by a person whom the party authorized to make a statement on the subject." Fed. R. Evid. 801(d)(2). The exhibit is a form addressed to the defendant, care of Sheryl Pont. Filing 52-3. The form was filled out by hand, and bears Pont's signature, as well as her title of "Controller." Filing 52-3. Thus, there is a sufficient basis to conclude either that Pont was "the party's agent or employee," and was commenting "on a matter within the scope of that relationship and while it existed," or that she was "a person whom the party authorized to make a statement on the

---

[2] It is true that a failure to authenticate exhibits violates NECivR 7.1. And the Court does not condone such basic disregard for the local rules. Nonetheless, it shall consider this evidence in its determination.

subject." *See* Fed. R. Evid. 801(d)(2). Accordingly, the Court will not strike filing 52-3 on the hearsay grounds.

B. <u>Hearsay evidence</u>

Next, the defendant moves to strike various portions of the plaintiff's brief in opposition to summary judgment because they rely on inadmissible hearsay. Filing 54 at 3.

First, the defendant objects to a portion of Troutner's deposition in which Troutner recounts what Vitamvas told him Dillon had said. *See* filing 54 at 3. Troutner stated,

> [Prickard] was later fired again by—by Steve Vitamvas which was—he was told by Chris. He told me, and I was out of town at an auction also when this happened. And he was given the same explanation of why to let Mr. Prickard go, because he didn't want his type there, you know, that—he said he just didn't like the way that he rolled—strolled around the—the dealership and—and such or whatever and the way that he talked to the other employees and everything at—at the dealership and said that we didn't want his type working there; so he told Steve to let him go.

Filing 52-1 at 4.

There are, potentially, two levels of hearsay at issue: Dillon's alleged statements, and Vitamvas's alleged statements. First, Dillon's alleged statements are not hearsay. Statements made by the owner of a company about hiring and firing employees are clearly statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." *See* Fed. R. Evid. 801(d)(2).

It is somewhat less clear, from the evidence presently before the Court, whether Vitamvas's alleged statements constitute hearsay. The deposition testimony itself does not establish when or in what context Vitamvas told Troutner of Dillon's comments. Accordingly, the Court cannot determine whether Vitamvas's alleged statements to Troutner were made within the scope of Vitamvas's employment. But the Court need not decide the issue; as noted above, the proper objection to evidence offered in opposition to summary judgment is not merely that it is inadmissible, but that it cannot be presented in admissible form at trial. And here, it is clear that Vitamvas's alleged statements could readily be presented in admissible form at trial: the plaintiff would need only call Vitamvas to testify as to what Dillon told him.

Next, the defendant objects to a portion of Troutner's deposition in which he recounts statements Mike Dillon allegedly made to him about

7

hiring African-American employees. Filing 54 at 3. Mike Dillon is Chris Dillon's father. Filing 50 at 3. Troutner stated,

> And [Mike Dillon] says—"Well, from this time forward," he goes, "anybody that comes in has to come through me, fill out an application, and I'll hire anybody that's going to be hired from this day—from this day forward for Dillon's Auto." He goes, "'Cause that will be the last nigger that Dillon's Auto ever hires." And he told me that—he goes, "You know, you look at—I've been in business at Cross Dillon Tire for thirty years," and he goes, "And I've never had none of these problems because—'cause I don't hire them. I don't hire their type."

Filing 52-1 at 5 (formatting omitted).

  The Court notes that there is some dispute as to whether Mike Dillon was an agent of the defendant company, and what the scope of that agency was. *See*, filing 50 at 3; filing 52 at 3–4. But there is a sufficient basis to conclude, for purposes of admissibility, that the instructions Mike Dillon allegedly gave regarding ongoing hiring and firing decisions at the defendant company were on a matter within the scope of his agency. Thus, the Court will not strike this portion of Troutner's deposition on the basis of hearsay.

  Finally, the defendant objects to a portion of Troutner's deposition in which he recounts comments allegedly made by Chris Dillon to Eric Mauer out of Troutner's earshot. According to Troutner, Mauer told him,

> [Dillon] kept using the N-word, calling them the N-word over and over and said, "Fuck you niggers. I own you guys" and certain, you know—I guess, you know, throwing that word out there the whole time. And "I could buy you guys. You don't know how much money—you don't know who I am" and to that effect.

Filing 52-1 at 6.

  Again, there are potentially two levels of hearsay at issue: at the first level are Dillon's alleged statements, and at the second level are Mauer's alleged statements. To begin with, Dillon's alleged statements are not hearsay, because they are not offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c)(2). The plaintiff offers these statements not to demonstrate that Dillon actually did own or could buy his employees, but to demonstrate that Dillon had racial animus against African-Americans. Mauer's alleged statements, however, are hearsay: they are offered to show that Dillon actually did make the statements that Mauer asserted he did.

8

However, even though Mauer's alleged statements are not currently in admissible form, the defendant has not shown that they could not be presented in admissible form. The plaintiff would need only to call Mauer to testify as to what Dillon told him to eliminate any hearsay issues. Accordingly, the Court will not strike this portion of the deposition on the basis of hearsay.

C. Allegations without pinpoint citations

Finally, the defendant moves to strike portions of the plaintiff's brief that fail to include pinpoint references to the evidence relied upon. Filing 54 at 4. It is true that NECivR 56.1(b)(1) requires such pinpoint citations when responding to a moving party's statement of material facts. However, the plaintiff has included pinpoint citations in his response to the defendant's statement of disputed material facts and in his argument that follows. The only portion of the brief which does not contain such pinpoint citations is the section labeled "FACTS" which comes immediately *before* the response to the defendant's statement of disputed material facts. *See* filing 52 at 2–3. The Court understands this portion of the plaintiff's brief to be a mere introduction, summarizing the evidence and arguments the plaintiff makes later in his brief. Accordingly, the Court will deny the defendant's motion to strike this portion of the plaintiff's brief.

II. Motion for Summary Judgment

The defendant moves for summary judgment on the plaintiff's claims that he was constructively discharged due to a hostile work environment based on race in May 2013, that he was terminated based on race in November 2013, and that he was subjected to a hostile work environment based on race. Filing 50 at 2.

Under 42 U.S.C. § 2000e-2, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." An employer has committed an unlawful practice when "race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

Claims of employment discrimination based on race brought under 42 U.S.C. § 1981 are subject to the same analytical framework as those brought under Title VII. *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 n.2 (8th Cir. 2010). And the Nebraska Fair Employment Practices Act contains a provision nearly identical to 42 U.S.C. § 2000e-2. *See* Neb. Rev. Stat. § 48-1104. Nebraska courts have held that the Nebraska Fair Employment Practices Act

9

"is patterned after 42 U.S.C. § 2000e et seq., and it is appropriate to look to federal court decisions construing similar and parent federal legislation." *Bonn v. City of Omaha*, 814 N.W.2d 114, 121 (Neb. Ct. App. 2012).

A. <u>Termination</u>

The defendant moves for summary judgment as to the plaintiff's claims that he was constructively discharged because of racial harassment in May 2013, and that he was actually discharged based on race in November 2013. *See* filing 50 at 7.

*1. May 2013 resignation*

First, the plaintiff alleges that he "was constructively discharged from the Defendant's employment in May, 2013 due to the racial harassment and due to the fact that the Plaintiff was shorted commissions that were due and owing to him from the sale of a vehicle." Filing 1-1 at 2. The defendant moves for summary judgment on the grounds that the plaintiff's resignation did not result from racial animus. *See* filing 50 at 10.

"Just like any other discharge, a constructive discharge is an adverse employment action," under Title VII. *Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 825 (8th Cir. 2006). An employee has been constructively discharged "when an employer deliberately renders the employee's working conditions intolerable, thereby forcing [him] to quit." *Baker v. John Morrell & Co.*, 382 F.3d 816, 829 (8th Cir. 2004). To establish constructive discharge, "a plaintiff must show (1) a reasonable person in his situation would find the working conditions intolerable, and (2) the employer intended to force him to quit." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007). To prove the second element, the plaintiff may produce evidence showing that "resignation was a reasonably foreseeable consequence of [the employer's] discriminatory actions." *Hukkanen v. Int'l Union of Operating Eng'rs*, 3 F.3d 281, 285 (8th Cir. 1993).

The defendant contends that the plaintiff has no evidence establishing that he was constructively discharged, arguing that "Plaintiff's resignation in May 2013 cannot serve [as] the basis for an adverse employment action," because "Plaintiff repeatedly admits that his decision . . . to voluntarily resign had nothing to do with racial discrimination or racial animus." Filing 50 at 10. And the Court agrees. "To prevail on a claim that [he] was constructively discharged, an employee must show that [his] employer deliberately created objectively intolerable working conditions with the intention of forcing the employee to resign and that the employee actually resigned as a result of those conditions." *Moisant v. Air Midwest, Inc.*, 291 F.3d 1028, 1032 (8th Cir. 2002); *see*, *Summit v. S-B Power Tool, (Skil Corp.), a Div. of Emerson Elec. Co.*, 121 F.3d 416, 421 (8th Cir. 1997) (finding no constructive discharge occurred where "it was not her working conditions

10

that 'forced' plaintiff to resign, but rather being informed that she was being terminated from her employment [for cause]"); *Stricker v. Cessford Const. Co., 179 F. Supp. 2d 987, 1002–03 (N.D. Iowa 2001)* (finding no constructive discharge where the plaintiff "admitted that she quit only when she decided to move to Kansas with her boyfriend").

Here, the parties do not genuinely dispute that the plaintiff resigned in May 2013 because of the split commission—and possibly his personal dislike of Kyle and Engel. *See*, filing 50 at 4; filing 52 at 7. The plaintiff does not dispute that race played no role in the decision to split his commission. *See*, filing 50 at 4; filing 52 at 7; filing 51-3 at 17. Nor does the plaintiff contend that Kyle or Engel displayed any race-based animus toward him. *See*, filing 52 at 7; filing 51-3 at 16. And although the plaintiff contends that Dillon made racially charged comments to him, he has produced no evidence that those comments motivated him to resign. *See* filing 52 at 7. In fact, he expressly stated in his deposition that those comments were not the reason he resigned. Filing 51-3 at 18. Accordingly, the Court will grant summary judgment to the defendant on the claim that the plaintiff was constructively discharged from his employment with the defendant in May 2013.

*2. November 2013 termination*

Next, the plaintiff alleges that he was terminated from his second tenure of employment with the defendant in November 2013 on the basis of race. Filing 1-1 at 3. The defendant moves for summary judgment on the grounds that the plaintiff cannot produce sufficient evidence of discrimination. Filing 50 at 7.

To survive a motion for summary judgment with respect to his claim that he was terminated because of his race, the plaintiff must either present evidence directly indicating unlawful discrimination, or create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009). Direct evidence is that which establishes "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003)). "[S]tray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not constitute direct evidence. *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1152–53 (8th Cir. 2007) (internal quotations omitted). Rather, the plaintiff "must present 'evidence of conduct or statements by persons involved in the decision-making process that may be

11

viewed as directly reflecting the alleged discriminatory attitude.'" *Yates v. Douglas*, 255 F.3d 546, 548 (8th Cir. 2001) (quoting *Rivers-Frison v. Southeast Mo. Comm. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998)).

According to the defendant, the plaintiff can produce neither direct nor indirect evidence of discrimination. Filing 50 at 7. However, the plaintiff contends that he has produced evidence of both types demonstrating that his termination was motivated by discriminatory animus. *See* filing 52 at 11, 13.

First, the plaintiff contends that he has produced direct evidence that his termination was based on discriminatory animus. Filing 52 at 11. The plaintiff points to Troutner's testimony that Dillon told him to fire the plaintiff because he "didn't want his type working there." *See*, filing 52 at 11; filing 52-1 at 3–4. When Troutner asked Dillon what he meant by "his type," Dillon said, "You know what I mean." Filing 52-1 at 3–4.

According to the defendant, this statement is not direct evidence of discriminatory animus, because "his type" is a "facially race-neutral" phrase, and it would be mere speculation to conclude that Dillon was referring to African-Americans. Filing 50 at 8–9.[3] However, the plaintiff has produced evidence sufficient for a reasonable trier of fact to conclude that by "his type," Dillon was referring to the plaintiff's race. First, there is evidence that Dillon used a similar phrase when explaining his reasons for deciding to terminate Prickard, who is also African-American: according to Troutner, Vitamvas said that Dillon had instructed Vitamvas to fire Prickard because "we didn't want his type working there." Filing 52-1 at 4. Additionally, the plaintiff has produced evidence that, as a general matter, Dillon harbored discriminatory animus toward African-Americans. Troutner testified in his deposition that he had heard Dillon "use the N-word to refer to persons of color" numerous times. Filing 52-1 at 6. And on one occasion, Troutner stated, another employee named Eric Mauer told him that Dillon had made several racially charged statements to African-American employees, including, "Fuck you niggers. I own you guys. . . . I could buy you guys. You don't know how much money—you don't know who I am." Filing 52-1 at 6.

Thus, the plaintiff has produced evidence sufficient for a reasonable jury to potentially conclude that by "his type," Dillon was referring to the plaintiff's race. Accordingly, the plaintiff has produced direct evidence that Dillon's decision to terminate the plaintiff's employment was motivated by racial animus. Because the Court concludes that the plaintiff has produced

---

[3] The defendant also argues, "The assumption that 'his type' refers to race or color relies on assumption that only African-American individuals can be accused of theft or embezzlement." Filing 50 at 8. But, of course, the plaintiff's contention is that he was *not* terminated based on accusations of theft or embezzlement.

12

direct evidence of discrimination, it need not reach the parties' arguments regarding whether the plaintiff has produced indirect evidence creating an inference of discrimination as required by the *McDonnell-Douglas* framework.

B. Hostile work environment

Next, the plaintiff alleges that he was subjected to a hostile work environment during both tenures of his employment. Filing 1-1 at 4. The defendant moves for summary judgment, arguing that the plaintiff has not produced evidence that the discriminatory conduct he experienced was sufficiently severe or pervasive as to constitute a hostile work environment. Filing 50 at 12.

To establish a claim of hostile work environment under Title VII, the plaintiff must produce evidence showing that (1) he is a member of a protected group; (2) he was subject to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of employment. *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011). But discriminatory conduct only affects a term, condition, or privilege of employment when it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations omitted). And the conduct must be both objectively hostile, and perceived as such by the alleged victim. *Clay v. Credit Bureau Enters.*, 754 F.3d 535, 540 (8th Cir. 2014).

Initially, with respect to the plaintiff's first tenure of employment, the defendant argues that the plaintiff could not have been subjected to a hostile work environment because his resignation "was not due to any racial comments made at Dillon Auto or by anyone at Dillon Auto or any perceived racial animus at Dillon Auto." Filing 50 at 12. The defendant also points out that the plaintiff later sought to be rehired by the defendant. Filing 50 at 12.

This evidence may certainly be relevant to the issue of whether the plaintiff was subjected to a hostile work environment. However, it is not dispositive of the issue as a matter of law. Although "a hostile work environment can form the basis for a constructive discharge allegation, hostile work environment discrimination can exist absent a 'tangible employment action.'" *Winspear v. Cmty. Dev., Inc.*, 574 F.3d 604, 607 (8th Cir. 2009) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 143 (2004)). In other words, a plaintiff can establish a hostile work environment claim even where he was not constructively discharged. The plaintiff may not have left his employment with the defendant because of a hostile work environment—but that does not mean as a matter of law that such an environment did not exist, or is not actionable.

13

Next, the defendant contends that "nearly all of the alleged discriminatory comments made by individuals at Dillon about race or color were comments that Plaintiff only heard about second-hand." Filing 50 at 12. These second-hand comments, the defendant argues, "can only be labeled as isolated, infrequent, not physically threatening, and certainly cannot be said to have unreasonably interfered with Plaintiff's work performance." Filing 50 at 13.

But, in fact, the plaintiff has also produced evidence that Chris Dillon made racially discriminatory comments directly to him. The plaintiff stated in his deposition that Dillon "said stuff to me as far as racial—racial stuff," including comments "that I was too good of a salesman to be trying to help black people, and a lot of blacks can't buy vehicles, they're dead beats, I am wasting my time." Filing 51-3 at 18. Whether conduct rises to the level of harassment is usually a factual determination for the jury. See *Moring v. Arkansas Dep't of Corr.*, 243 F.3d 452, 456 (8th Cir. 2001). Here, the evidence presented is sufficient for a reasonable jury to potentially find that the plaintiff was subjected to a hostile work environment.

III. <u>Alternative Motion for Partial Summary Judgment as to Damages</u>

Finally, the defendant moves in the alternative for partial summary judgment on the issue of damages. Filing 50 at 13. The defendant contends that the plaintiff's claim for back pay should be tolled for the period between the end of his employment by the defendant in November 2013 and the beginning of his employment at Morrissey Motors, and that his claims for both back and front pay should be terminated beginning in January 2015, when he was incarcerated. Filing 50 at 13.

First, the defendant argues that the plaintiff's claim for back pay "was tolled from November 26, 2013 until January 2014, because Plaintiff removed himself completely from the job market" during that time. Filing 50 at 13. "When an employer makes a discriminatory employment decision against an individual, that individual has a duty to look for another position to mitigate his damages." *Chalfant v. Titan Distribution, Inc.*, 475 F.3d 982, 992 (8th Cir. 2007). His efforts to find work need not "be successful but must represent an honest effort to find substantially equivalent work." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002). The employer has the burden to prove that the individual did not mitigate his damages. *Id.* And if a plaintiff has failed to mitigate his damages, his award of back pay will be offset by any wages that could have been earned with reasonable diligence after the illegal discharge, regardless of whether they were actually earned. *See* 42 U.S.C. § 2000e–5(g)(1).

Thus, where a plaintiff voluntarily chooses to remain unemployed for some period of time due to personal—as opposed to business or economic—

reasons, the plaintiff's award of back pay is tolled for that period of time. *Cf. E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992). For example, in *Delight Wholesale*, after the plaintiff left her employment with the defendant, she began work at another job, which she later quit "for personal reasons, including her health and the need to spend more time with her daughter." *Id.* Sometime later, she obtained a different job. *See id.* The Eighth Circuit held that "the district court properly tolled the [plaintiff's] back pay award during the period between [her] voluntary quit and her next full-time permanent position." *Id.*

The parties do not genuinely dispute that the plaintiff could have started working for Morrissey Motors almost immediately after his termination, but that he chose not to in order to be with his family for the holidays. *See*, filing 50 at 5; filing 52 at 9. Thus, as in *Delight Wholesale*, the plaintiff voluntarily chose to be unemployed for personal reasons. Accordingly, his claim for back pay should be tolled during the period in which he could have worked at Morrissey Motors, but chose not to.

Second, the defendant argues that the plaintiff's "claim for back pay and front pay was terminated by January 2015" when the plaintiff became incarcerated. Filing 50 at 13. The Court will consider in turn whether the plaintiff's incarceration affects his claim for back pay, and whether it affects his claim for front pay.

An award of back pay in an employment discrimination case is intended to put the plaintiff in the position he would have been in but for his unlawful termination. *See Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1111 (8th Cir. 1994). Thus, when a plaintiff becomes unavailable to work post-termination for reasons not attributable to the defendant's conduct, he is generally not entitled to collect back pay for the time period in which he was unable to work. *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 383 (1st Cir. 2004); *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999); *Thornley v. Penton Publication, Inc.*, 104 F.3d 26, 31 (2d Cir. 1997); *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1101 (3d Cir. 1995). Rather, he is entitled only to whatever benefits the defendant would have extended to him, had he been employed by the defendant at the time he became unable to work. *See Johnson*, 364 F.3d at 383 n.17; *Thornley*, 104 F.3d at 31. For instance, in *Thornley*, a plaintiff who became disabled after his termination was entitled to payments under the defendant's long-term disability plan, but was not entitled to back pay. *See Thornley*, 104 F.3d at 31.

Here, the parties agree that the plaintiff was incarcerated between January 8, 2015 to July 2, 2015. Filing 50 at 6. Thus, the defendant argues, the plaintiff "ceased all efforts to obtain other employment comparable to his

15

job at Dillon Auto." Filing 50 at 13. The plaintiff counters, "It is entirely possible that the plaintiff will not seek lost wages for the time he was incarcerated, however it cannot be ignored that he began his employment with Dillon while out on work release." Filing 52 at 18. The plaintiff is suggesting that perhaps he could have been on work release during his incarceration from January to July 2015. The defendant replies that "there is no evidentiary support to dispute that Plaintiff engaged in no efforts to obtain employment when he was incarcerated in January 2015." Filing 55 at 7.

A party moving for summary judgment has the responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson*, 643 F.3d at 1042. But when the party moving for summary judgment on a particular issue bears the burden of persuasion on the issue at trial, it must not only demonstrate the absence of a genuine dispute of fact, but also produce evidence that would be sufficient to sustain its burden at trial. *See Celotex Corp. v., Catrett*, 477 U.S. 317, 331–32 (1986) (Brennan, J. dissenting). As previously noted, it is the defendant's burden to establish that the plaintiff failed to mitigate his damages. *Hartley*, 310 F.3d at 1061.

Thus, for the defendant to be entitled to summary judgment on this issue, the defendant must produce evidence sufficient for a reasonable jury to find that the plaintiff was either unavailable to work, or failed to look for comparable employment opportunities between January 8, 2015 and July 2, 2015. As the plaintiff has pointed out, evidence that the plaintiff was incarcerated is not, by itself, sufficient to meet this burden. And the defendant has produced no other evidence (at this point) showing that the plaintiff was unavailable to work or failed to look for comparable employment during his incarceration. Accordingly, the Court, at this juncture, will deny summary judgment as to this issue.

Next, the defendant argues that the plaintiff's claim for front pay should be terminated as of the date of the plaintiff's incarceration. Filing 50 at 13. In contrast to back pay—which compensates a plaintiff for wages lost between his termination and the judgment—front pay is meant to compensate the plaintiff for wages that will be lost after judgment is entered. *See Olivares v. Brentwood Indus.*, 2016 WL 2772598, at *3 (8th Cir. May 13, 2016). "A district court may award 'sufficient front pay to make a party whole when reinstatement is impractical or impossible.'" *Ollie v. Titan Tire Corp.*, 336 F.3d 680, 687 (8th Cir. 2003) (quoting *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 555 (8th Cir. 1998)). As with back pay, a plaintiff has the duty to

16

mitigate his front pay damages by seeking comparable employment. *Sellers v. Mineta*, 358 F.3d 1058, 1066 (8th Cir. 2004).

The defendant relies on *Shick v. Illinois Dep't of Human Servs.*, 307 F.3d 605, 607 (7th Cir. 2002) for the proposition that an award of front pay is terminated as a matter of law when a plaintiff becomes incarcerated. Filing 50 at 13. However, this argument misconstrues the court's holding. In *Schick*, the Seventh Circuit concluded that the district court erred in awarding the plaintiff front pay because the award encompassed the time period in which the plaintiff was expected to be incarcerated after the judgment was issued. *Shick*, 307 F.3d at 614. In other words, the plaintiff's incarceration was relevant to the issue of front pay only because his incarceration would render him unavailable for work after the judgment was issued.

Here, there is no evidence suggesting that the plaintiff will be incarcerated after the judgment is issued. Nor is there evidence to suggest that, as a result of his prior incarceration, the plaintiff will be unavailable to work or that he will fail to seek comparable employment after the judgment is issued. Thus, the defendant has not demonstrated why the plaintiff's prior term of incarceration is relevant to any potential award of front pay. Accordingly, the Court will deny summary judgment as to front pay.

IT IS ORDERED:

1. The defendant's motion to strike (filing 53) is denied.

2. The defendant's motion for summary judgment or, in the alternative, motion for partial summary judgment (filing 49) is granted in part and denied in part, as set forth above.

Dated this 23rd day of June, 2016.

BY THE COURT:

John M. Gerrard
United States District Judge

17